Chicago Teachers v. Board of Education May it please the court, good morning. My name is Randall Schmidt and I represent the plaintiffs in this appeal. The primary issue in this case is whether commonality for purposes of Rule 23 is established in a situation where a single decision maker exercising power under a uniform process, and that process included both objective as well as subjective criteria, made the decision to turn around 10 of the Chicago public schools. I would just to start you off, I just, are you limiting your request for injunctive relief to only those policies and metrics that were used objectively across the board to each school in the first and second rounds of decision making? Well, what we are challenging is the outcome at the very end of the day. Yeah, sure. Right, and so our theory is that the whole turnaround process, which can't be sliced and diced, but is the whole process, resulted in this discrimination. The district court concluded that if the test had been purely objective, that it might satisfy commonality, and so we said, well if that in fact is the law, then under Connecticut v. Teal, any part of this process that is discriminatory taints the whole process, and so we should look at those. And so yes, if that is in fact the law, our position would be that the process to first select the 250, 224, whatever it was, schools, as well as the NICS process to select the 74, we would have to look to see if that also was discriminatory, and that would be consistent with Connecticut v. Teal. But I think the district court erred because it concluded that commonality wasn't established because of these, what the district court called qualitative factors and what I call subjective factors at the last stage. And the court's ruling with respect to that is incorrect for two reasons. First, the court recognized that this decision was made by a single decision maker. The CEO of the Chicago Board of Education selected the 10 schools. And that, under the existing law, the fact that a single decision maker, exercising discretion, makes a decision is sufficient for commonality. Well isn't the fact that the board then approved that decision maker's determination and approved of 10 schools for turnaround, wouldn't that undercut that analysis that there was a single decision maker? I don't think there's any argument that the board did anything other than pro forma except the CEO's recommendation. State law gives the power to decide which schools are turned around to the, in the words of the statute, the superintendent, but to the CEO to make the recommendation to the board recognizing that the board will approve it. But even if the board does count, certainly the Scott case in the Fourth Circuit suggests that a small group of high-level decision makers making that decision is sufficient and we would argue that the CEO plus the small group of board members making the decision is sufficient to establish commonality. But doesn't having multiple decision makers at the school level and different reasons for alleged failure erode commonality? In other words, I mean, you know, suppose you have turnaround school number one is on the list because the principal had decided she would only hire first-year teachers for her school. School two is on the turnaround list because the principal had instituted a policy whereby any student who misbehaved had to sit in a chair for, in a study hall doing nothing for three days. You've got school three on the list because the principal has decided to emphasize the arts over the traditional curriculum and, you know, because of that scores on measurements have dropped. So, you know, you have all these multiple decision makers. But I think there's two problems with that characterization of this. First, there are multiple decision makers. There's input from those principals, there's input from that, but the decision maker is the CEO. And the process by which those individuals give input to the CEO is all the same process. They look at various criteria. They're spelled out in the school action guidelines. They look at school safety. They look at gang boundaries. They look at that for all the schools. And then that inquiry, which is uniform for all 74 schools, certain factors are emphasized, certain factors aren't. So that's the first issue. The second is that this is a pattern and practice case. And in the pattern and practice case, ultimately you look at the bottom line. Did this decision, is it part of a pattern and practice of discrimination? In Bolden, this court's case involving overtime of workers, if that case is certified, the issue isn't going to be why one worker got overtime and why one didn't. The issue is going to be at the end of the day, the supervisor exercising discretion, did it show, and in that case it's actually an adverse impact, did it show that race was the motivating factor or race was a factor in terms of the ultimate award of overtime. So for that reason, the fact that the answers about why the schools were turned around are all different isn't the issue. The issue is, was the process part of a pattern and practice of racial discrimination? Is your position there should have been no reduction of schools? Or not reduction, but change of administration in the school? That's a merits question. And so at least our position would be, if there's going to be changes in the school personnel, it should be done on a non-discriminatory manner. It should not impact. What about the 49% of non-African American teachers who were displaced? Aren't you seeking a remedy for barely half of the similarly situated class members? Right, well the class members under Title VII would be the African Americans. And so that's, the law protects them. But certainly in terms of our B-2 remedy, our class-wide injunction stopping the turnarounds, that would apply to everyone, no matter what. That injunction barring turnarounds would not only benefit the class, but also other teachers who are being subjected to this discriminatory process, even though they have no claim for discrimination because they're white. And I want to point out that that 49% includes Hispanics as well as whites. Every case involving commonality has to start with the Supreme Court's decision in Walmart. In Walmart, the district court, I think, concluded that it required, in essence, an objective test throughout the process for commonality. But a careful read in Walmart suggests that that's not correct. Walmart doesn't stand for the proposition that anytime there is subjective decision-making, the commonality isn't made. In fact, Walmart explicitly states and gave as an example a common contention in a case involving the assertion of discriminatory bias on the part of the same supervisor. And then this court in Bolden, which I mentioned before, following up on that idea from Walmart, recognized that discretion exercised by a common supervisor in awarding overtime might be the basis for commonality. In Bolden, the class action across 262 worksites with multiple supervisors, and the court reversed the certification of that class but remanded it to give the plaintiffs the opportunity to try to prove the elements of Rule 23 for job-specific supervisors. The issue in those cases would be numerosity. Are there enough workers getting this overtime by any individual supervisor? That's not the case. It's not numerosity. But again, we have a single decision-maker making the decision. Is there any injury to a class member who was in a reconstituted school but went to the reassignment pool and immediately found a permanent teaching position before losing any pay or benefits? That would go to the issue of damages, but in terms of the harm, the adverse action is being displaced, being displaced from your permanent teaching assignment and having to go into the reassigned teaching pool. But once you're there, the remedy—you're right, there may be no remedy because you got another assignment, but that's not all the class. Certainly not all of the class members were entitled to go to the reassigned teacher schools. Some of them went to the cadre pool. There was less salary there. And some of them were just outright discharged, and there's nothing there. But our focus on the adverse action is the decision to displace them and turn them around. That that is, in fact, the adverse action in this case. And then let me just point out, we pointed it out in the briefs, that the Fourth Circuit and Scott also followed up on Walmart and recognized that a small group of high-level decision-makers, exercising discretion, still would be sufficient to find commonality. But in this case, we have more than just a common decision-maker, the CEO. We also have this uniform process. The 30B6 witness for the Board of Education testified that although there wasn't an explicit policy that said, here's how you do turnarounds, there were these decisions. And those guidelines applied to all 684 schools, that narrowed them down to the 250 of the 224, that then narrowed them down to the 74. And then the process and the guidelines of looking at various factors and getting community input were followed. Then the process for public hearings and then the process for recommendations to the Board were all followed. So there was this uniform process. So we think that the court... Excuse me, but didn't, in fact, the trial court judge make a specific factual finding that in selecting the 10 schools for board approval, the CEO applied a qualitative criteria that varied from school to school? And doesn't that undercut, again, the argument you're making that this was one uniform turnaround policy? What the district court there is referring to is the answers that came out of this inquiry. Not that there wasn't the same inquiry, but that for some schools the gang locations mattered and others school safety and others input from the community. The answers to the inquiry, but the inquiry to get those answers was the same for all 74 schools. Could I ask you how you intend to go about, assuming the case goes forward, the proof of discrimination in this case? So what we've alleged is a pattern in practice. And so what we would do is get statistical evidence not only on these 10 turnarounds, but the whole history of turnarounds since they started in 2004, and using that statistical evidence show that the pattern in practice was that they're selecting schools on the south side and west side of Chicago with a disproportionately high number of African-American teachers. With discriminatory intent? For the adverse impact part of it, we don't have to show discriminatory intent. For the pattern in practice, discriminatory intent is basically shown by this pattern in practice. We would supplement that with anecdotal evidence of discrimination. I can think of examples of two schools that once we look at all the answers to the questions are very, very similar. One in a white neighborhood, one in an African-American, and time after time they choose the African-American school. But that's a question of merits that at this point we haven't gotten into that discovery and stuff. But at this stage it's simply can this case go forward as a class action to challenge the 2012 turnarounds as a whole? The second issue that I want to address- You wouldn't need separate trials regarding liability on the objective criteria for each plaintiff? I didn't hear the last part of it. You would not need separate trials regarding liability on the objective criteria for each plaintiff? And we think we would not also need separate trials for a determination that the whole process including the subjective factors was discriminatory. Once that decision is made on a class-wide basis, it will apply to all 213 plaintiffs. And then the issue would be in terms of any individual hearings, what damages are available? And that was the point I wanted to make with respect to the court's decision with respect to our B2, B3, and C4. I take it that your bottom line is that the individual class members were not individually assessed before being placed in the first two lists? There's no dispute that they were. Once the school was selected, they were selected. And to answer the Wal-Mart question, why was I disfavored? In this case, I was disfavored because my school was selected for turnaround by the CEO using this uniform process and that that process had either a disparate impact or was a part of a pattern and practice of discrimination. And that answer to that question is the same for all 213 class members. It's different than the other cases in which different answers for why they didn't get the relief would differ. I see I'm into my rebuttal time, so I think unless there are other questions, I'll reserve the rest for rebuttal. Thank you, Counsel. Mr. Eaton. May it please the Court, my name is Tim Eaton and I represent the, I believe, the Board of Education of the State of Chicago. Your question was important initially, just to put this in context. The plaintiff's complaint concedes that this action was done to fix failing schools. There were options that the board had to fix failing schools. One of them was provided by the state legislature, which is this process of reconstitution, that you change everything in the school, top to bottom. That's the legislature's policy that allowed the school board to take that action if they thought that was the best measure. So the question really became, in deciding whether or not there should be a class, why were these ten schools selected? And that's the critical question. What was the common policy or question that was the rationale for selecting these ten schools? Plaintiff's motion for class certification could be granted only if there is a single common answer or answers that will address the relief they are seeking. In other words, in Walmart terminology, what is the glue that's holding together these allegations that relate to this policy? Okay, but did the district court ignore the first step in the process, which is TEOP, which says that if one step of the hiring process was discriminatory, then the whole process is changed. And isn't it true that all of the schools on the turnaround list, which is the first step in the process, had a majority of African American teachers? Your Honor, the answer is no, she did not ignore it, and this is why. There was no allegation, if you read the complaint, about that first step being discriminatory, nor was there any argument below. It's been raised for the first time and we would deem, first of all, it's way. But it's an important issue, so I want to address it as we did in our brief. The first step being? The first step was going from the 224 schools to the 74. Yes, Your Honor. There's no evidence, there's no significant proof that that was discriminatory. It was done on objective factors, it was done on metrics dealing with performance. But there's no statistics in this record or allegations in the complaint that shows how many African American teachers were affected by that first step. There's no allegations that that first step was only geared towards the south or west side, which seems to be a theory that they're backing off on in their briefs. Because in fact- Well that was the other question. Yes. Was this a south side, west side reduction or did it apply across the- The reduction from 224 to 74, there are approximately 10 schools that are on the north or northwest side that were among that 74. Other schools among that 74, some were closed. What the heart of this case is about is actually, Judge did you do individual considerations in each circumstance? And the answer is, yes, they did. The circuit, excuse me, the district court held that the turnaround process was not well defined and uniformly applied, therefore it fails to meet the commonality requirement. In each case, they looked at factors that were different. For example, the district is divided up into 19 different networks. There's a network chief that had a tremendous amount of input into these decisions. As a matter of fact, this isn't quite a top down decision. This is really a bottom up decision. It's coming from the local school councils. It's coming from the local political officials. It's coming from parents. And what's at stake here is the children's future at those schools. These are not schools that are being closed. These are schools in which the children can go back to. And some of the factors that they considered, for example, Smith School. There were five schools that were recommended in the Lake Calumet network. The network chief looked at those five schools, had hearings, talked to parents. And at the Smith School, the Wendell Smith Elementary School, which was chosen for reconstitution, the local school council had voted to fire the principal. There was a culture there that they did not think was good for children to learn. That school was selected by the network chief and recommended to the superintendent after hearings and input. There's another network called the Garfield Humble Network. That network chief made a recommendation with respect to two schools, Casals and Piccolo. In Casals, he determined, and she determined, excuse me, that there was a culture of complacency. We have to do something to turn that school around. In Piccolo, it may have been a candidate for closing, but because a nearby school, Noble, was overcrowded, the network chief said, we can't close. We have to reconstitute. So there was no one common answer to each one of these decisions that was made. This was a decision that was made on the network level, that recommendations were given to the school superintendent. And your honor, it just defies credulity to think that the superintendent of the schools, who has over 600 schools, hundreds of thousands of kids, is going to say, it's my decision that I'm going to close this school, that was from the bottom up. Can you help me with this? Mr. Crosby, testifying on behalf of the board, stated that there wasn't one set of factors that necessarily was considered in every school that was recommended for reconstitution. But this, I think, well, you'll help me, this refers only to the ultimate decision. In choosing the first round of 226 schools, certainly there was a uniform criteria applied. Isn't that correct? There was for the most part. The only exception to that, your honor, was Tilden. Tilden was a school that was at the level two probationary status. The other schools were all at the level three. And there was, if you decided that decision solely on the metrics, Tilden would not have been selected. But there was discretion exercised because 15 out of the 16 last year, Tilden had been on probation, they just had a principal that left. So there was some discretion involved, but for the most part, to answer your question, the answer is yes, there was strictly metrics. But again, this class is made up of teachers that were from the 10 schools. There's no injury to the other 63 or 64 schools that are not involved in this class because those schools for the most part remained open. There may have been some closures, but there's been no significant proof, which is what Walmart requires, that there was any discrimination in applying those objective metrics. Your honor, they haven't indicated what is the metric, what is the common issue in those metrics, even if you limit it to the first step, that's discriminatory. Is it the performance? Is it the attendance, which is part of performance? Is it the graduation rate? Is it the ACT in the high schools? Is it the ISET? There's no allegations in this complaint that relate to a specific discriminatory metric that was applied in that first step. Well, would that come out in discovery? I mean, without getting into a discussion of the underlying merits, strictly speaking of the class certification issue, couldn't an injunction in this case be limited to one that enjoined the board from using whatever metric it used across the board that had the effect of impacting a disproportionate number of African-American teachers? Your honor, I believe that Walmart taught us that there has to be some look at the merits to determine in going forward whether or not there's significant proof of discriminatory policy or a common contention. There's no allegation of that. But here, has there been a conflation of the difference between class-wide and individual relief? No, your honor, I don't believe so. What the district court was saying in her opinion was that there is no common policy because to determine liability, not relief, there were individual circumstances that were taken into account as to each school. So we're talking about whether there's liability, not whether you're getting into individualized relief, which I believe is another issue. So what she said is that this record does not suggest that a uniform policy was applied throughout the process, the examination of which would resolve each class member's claim. The decision was not based on uniform criteria, but instead was individualized. So when we're talking about individualized, she's talking about the decision to reconstitute the school, not the individualized relief that may be important in looking at relief if there was liability. And by the way, counsel had mentioned this. But, oh forgive me, class-wide relief doesn't include reinstatement, back pay, and particularized injunctive relief? Well, they're seeking relief under 23B2, B3, which would get into individualized relief. C4, which is the situation where I think at least this court suggested in McReynolds that if there was a common question that could be decided before you get to relief, that that was maybe an appropriate vehicle. But what the district court was struggling with is there has been no common issue or contention that Walmart requires that this court required in McReynolds, such as in McReynolds there were two common issues. One, whether or not the brokers, by being able to choose their own group, led to discrimination. And secondly, once those groups were formed and successful, the distribution of the accounts. Those were here are individualized issues regarding these 10 different schools. And there's been no allegation with respect to the metrics that were applied. Well, there might be some trials about individual relief, but the initial determination would still save judicial resources because, I mean, you don't need separate trials regarding liability on the objective criteria for each plaintiff. I agree. If you're talking about the first step only, Your Honor, with respect to the step that was before the district court, and that is the 10 schools which this group has be individualized determinations as to each school because there was no one common thread that was throughout. Right, and the individual class members weren't individually assessed before being placed on the first two lists. They were displaced according to one uniform policy. Well, they were displaced according to a legislative act that allows the displacement of all of the employees of that particular school. That was the Illinois General Assembly. And Judge Keeney, to your point, you ask, are you seeking to enjoin this entire turnaround process? Well, that would be suggesting that the act itself is unconstitutional. The turnaround process, the board is authorized to take that action if they believe it's something that should be done. And so they're not attacking the statute. The fact is, it impacts predominantly African American and Hispanic areas of the city, which then has the effect of affecting more African American teachers than it would in other parts of the city. It does, because the unfortunate fact is in some of those areas where you have predominantly African American or Hispanic kids in those schools, they're failing. And what the board is trying to do is take action that would turn that around. And if that means, and the legislature has approved of this action, reconstituting the entire faculty, principal, local school council, that's an action that they can take. Or they could close it, so the kids can't go back to their same school. So this was an act that was decided to improve the kids' education so they could go back to the same school. And it was decided on an individual basis. For example, the district court said, if these 10 schools were picked solely because they had the lowest performance metrics, then at least you would have a common contention as to whether or not that was discriminatory. That's not this case. What she found is that there were highly individualized factors considered in each school. Like I had said before, with respect to Piccolo, maybe a school that should have been closed, it wasn't because it happened to be near Noble. Casals, a culture of underperforming complacency, it was picked. Smith, because the parents wanted it closed. So these are individualized decisions that the district court believe does not find the commonality that's required under 23A. Likewise, we preclude a 23B2 or 23B3 because the common issues would not predominate, or even a 23C4 because there was no common issue that could be determined. That was her finding. When you get back to who had input, you talked about parents and you mentioned some other organizations, groupings, like regional things. Yes. First of all, just to quote your honor from the district court, turnaround decisions were made based upon input from stakeholders, voices and opinions depending upon each school in consideration. For example, the CTA with respect to transportation, there were some folks there that were considered. The local alderman was consulted. The local parent school council was consulted. These were groups within the community. What can we do here to make these kids' education better? And in each instance, there was a different factor that was considered. There was no common contention here that a particular discriminatory factor was applied across the board. Again, as the district court said, if you were only dealing with, say, the lowest performance metrics for each school in that area and those schools were chosen, then maybe that was a common contention that we would take a hard look at as to its impact. But that's not the case. What is it here that they would enjoy? They say, well, we'll figure that out later. Well, no. If you're seeking a class certification, you have to at least come up with a common question, a common practice that then can be considered as to whether or not there is one answer that would lead to an injunction, that would lead to individualized relief. We don't know what that is. We do know that there were common metrics in the first cut. They don't complain about the metrics that they disagree with. They just say they're discriminatory. Why? We have no indications of what impact based on that first cut because there's nothing in this record or nothing in their complaint or no argument that was made. That theory just came up later. But nevertheless, it doesn't hold water because there's no evidence in this record. There's no significant proof that they made that that first round was discriminatory. They say it, but there was no element of proof. They said that this decision was on a disparate impact which I agree they did not have to prove intentional discrimination on disparate impact. They say, well, it was based because all the schools are on the south and west side. Where's the evidence? There's no proof that that was done. That may have been the result because unfortunately again, kids in those areas may be in failing schools that need attention. But that was no policy of the board. There's no proof of that. There's no, I owed a proof of that and you can look at the merits. So we believe that they failed to meet the criteria that they had to meet to have a class. There's no commonality here and therefore you can't get into the 26B2 or 4 because that 23A requirement was not met. Respectfully, we believe that the school board did what it needed to do to try to fix failing schools which was this entire purpose. They, it had an impact on African-American teachers. By the way, and this is in the district court opinion, 75% of the tenured teachers that were impacted were rehired. It's in the district court opinion. So they're trying to do the best they can under these circumstances. Thank you. We respectfully ask that this court affirm. Thank you counsel. Mr. Schmidt. You have five minutes Mr. Schmidt. Thank you. So I think we all agree that things need to be done to improve Chicago public schools, but they can't be done on the backs of African-American teachers. And that's what this case is about. There's no dispute that they have the power to turn around schools, but that's not the only solution to fixing failing schools. But if they're going to do turnarounds, if the board's going to do turnarounds, it can't do them in a discriminatory manner. And during this, during the argument, counsel suggested that the question that this court should ask that is mandated by Walmart is why were these ten schools selected? That's not the correct question. The schools aren't suing for discrimination. The individual teachers are. And the question that holds this case together that these teachers are asking is why was I disfavored? I was disfavored as a teacher because my school was selected for turnaround and the turnaround process done by the CEO was done in a discriminatory manner. And we spent a lot of time during the argument talking about why the various schools were selected and the various factors, but that's the answers to the inquiry. And in this case, we never get there, right? We don't need to know that because this is an adverse impact or pattern of practice case. In the overtime case in Bolton, they're not going to do a hearing to find out why each worker did or did not get overtime. That's not what the inquiry is going to be. In McReynolds, when the case is back, if there's a question about whether those policies were discriminatory, the teaming policy and the distribution policy, there's not going to be an inquiry about why each team selected or didn't select any African-Americans for their team. The question is going to be the impact. At the bottom line, at the end of the day, when we look at what happens at the end of this process, were African-American teachers disproportionately impacted by these And the remedy, they keep saying we can't fashion a remedy. We can't fashion a remedy. We've suggested a remedy. A moratorium on turnarounds until a process can be determined to do them in a non-discriminatory fashion. The district court concluded that it could. How would you do that? Huh? How would you do it in a non-discriminatory fashion? How would you do a turnaround? First of all, I think that there are options other than turnarounds to improve failing schools and the statute provides all those other remedies and those could be tried. But if it's going to be done in a non-discriminatory fashion, then they can look at the impact. They can do some type of adverse impact analysis of the schools as they select them. There's no dispute that there were 250 schools that were eligible for turnaround under the state statute. And so, you know, if all of those schools are eligible, then they certainly can come up with a way to select out of that 250 the schools that are going to be turned around in a non-discriminatory fashion. In other words, schools that had fewer than a majority African-American teachers. No, I think they could do it that way or they could just come up with some type of adverse impact study that would look at it and say, okay, well we're going to, these are the schools that we're considering. These are the ones, they all can benefit from it. So these are the ones we're going to do so that there's an equal distribution of the impact on teachers. Could you give me a few examples of what other remedies are available under the statute other than turnaround? So there's remediation programs. They can close the schools, which certainly is not an option that we would be in favor, but they can do school improvement plans, they can assign additional money to that school, they can come up with specific goals, they can work with the school to try to get it to be better in terms of performance. Turnaround is just one of the options that the statute gives to the board and they don't have to follow it. And so then, let me just, I see I'm down to one minute. Again, we spent a lot of time talking about the subjective part of this and the fact that there were different factors, but at the end of the day, again, Walmart teaches that a decision made, a subjective decision made by a single decision maker is the basis for commonality and we have that here. And I agree that the CEO didn't know all these schools, which is why he got in the information, but at the end of the day, it was him, not the individual stakeholders, not the regional chiefs, not the CTA, it was the CEO who made the decision to select these 10 schools out of the 74 that were presented to him and out of the 250 that were initially eligible for it. So for these reasons, we court's decision and remand, and we request that it be remanded with instructions to certify the class so that we can move on to the merits and do the discovery necessary in this case. Thank you, counsel. Thanks to both counsel. The case will be taken under advisement.